Case number 24-1218. Thomas Henry McLamb, Petitioner v. National Labor Relations Court. Ms. Hazelwood for the petitioner, Mr. Sauter for the response. Hazelwood, good morning. Good morning. May it please the Court. Alyssa Hazelwood for Petitioner Thomas Henry McLamb. This case deals with two unlawful union actions. First, a union steward physically attacked a dissident at work while he campaigned for union office. And second, another union steward demanded that dissident's termination for the incident. The board created a narrative of events unsupported by the record to absolve the union for these actions. Substantial evidence does not support the board's decision. First, a union steward, Boone, physically assaulted McLamb in the workplace directly in the midst of a heated election campaign. In spite of this, the board claims that at one point, while Boone, McLamb and others... Excuse me, you need to start at the beginning because the record I read was McLamb verbally abused her. He started it. Then she slapped him. He got her fired. He still has his job. If he gets a ULP claim, how does that promote industrial peace? It promotes industrial peace because it protects Section 7 activity. Section 7 activity includes dissident union activity. He was a longtime opponent of current union leadership. And. What was the nexus between what he said about her and anything having to do with the union? So first, the record doesn't establish that he said these things about her. The record established that he said that that some people. We disagree with you about that. Can you answer Judge Henderson's question? Assume we think he was talking about. Even if he was talking about her, she was still a union steward, actively campaigning for his opponent. The record establishes and the board concedes that they were campaigning throughout the incident. They were campaigning at the beginning. The board says that McLamb pivoted to this personal attack on Boone, which is unsupported by the record. In reality, especially on the record. It was not supported by the record when what was said was so personal in nature. It was about her children and her license plates. That is not related to union activity. So the record, the record. Is replete with evidence that he continued throughout the day to say, I'm going to let it all out and let it all out on Tuesday, which the board concedes. Is related to his campaign about union financial mismanagement. Just because he made some some offhand statements to a union steward standard of review. It's just if there's one way of looking at it, which is the way you're saying, but there's another way of looking at it, which is the way the board looked at it and said, this was all personal in nature. And if it's supported by the evidence, we affirm. That's the substantial evidence is is a high standard, but it hasn't been met here. Even personal statements when made towards union stewards have been protected when they're encompassed within the union campaign. I'd like to direct. Are you asking us to hold that anything that's said during a union campaign is by its nature related to union activity? Like, there cannot possibly be any personal statements if it's at a union event made to a union steward. So I think that the Fifth Circuit's case, the Fifth Circuit's ruling in general, truck drivers is instructive here. In that case, I asked you a yes or no question. Is that what you're asking for? A ruling that says that. Anything that happens at a union event directed to a union steward is by definition union related, that there can never be personal comments made at such an event unless it is so appropriate as to lose the acts protection. That seems to be a different part of that test, whether it's related to. The union related activity is a different question than how extreme are the comments. So we don't agree that the comments were extreme, but that's not what I'm asking. I'm asking you that. Is there ever a scenario in which personal comments can be made? An event that is a union related event directed at a union related steward. Can there ever be personal comments at such an event or are they all such comments by definition union related? I think they'd be by definition union related. Thank you. I wonder, I'll ask your opposing counsel about what I think are some inconsistencies between this NLRB decision and some other decisions where very similar speech was treated as campaign speech. That might just mean that those prior decisions were incorrect and this one was correct, in which case they need to explain why they departed. Maybe did not explain. We'll get to that on the marriage, though, whether this should be considered protected speech. If an employee comes to work and even in the midst of a of a campaign event, union campaign event. If the employee says kind of vile language, you know, you're you're a bad mom and, you know, you're stealing from the government. Which is basically what you said here. It's disruptive. And let's say it had been not the union that punished him for it by hitting him, but it had been the employer that said, we just can't have this kind of personal attack in our workplace. That's not the kind of that's not the kind of workplace we are. And so, you know, you're suspended for a day without pay or something like that. Then I think in order for us to rule for you here today, we would also have to think that the employer can't can't punish this speech, even when it's highly disruptive to the to the employer's workplace. It seems like a actually seems like a very anti-employer rule that you're urging us to adopt. So I'm not here to defend employers, but I would point this court to Keywood Power Constructors, which says not every impropriety committed during section seven activity places the employee beyond the protective shield of the act. And that was an employer ULP. And the question is not whether the outburst was something to be encouraged, but whether it was so unreasonable as to warrant denying the protections of the act. Well, let me just ask this. What if instead of the union punishing your client by hitting him, it had been the employer who punished your client by suspending him from work for an hour with pay? Would that have been an unfair labor practice by the employer? Yes, and in fact, there was an unfair labor practice by the employer in this case that was settled right before the trial. Maybe that's right. That just seems like, boy, for us to come in and say an employer can't police disruptions in the workplace. It's a pretty tough rule for employers. Well, I wouldn't say that they can't police disruptions, but you but I think it's important to look at what he actually said here. He didn't he didn't make any outrageous statements. He said some employees had Virginia license plates. Boone should pay her bills and she should properly care for her children. And that's even taking the board's conclusion that he called out by name. These are not the types of of statements that the board or this court has held to be removed from the protection of the act. For example, do you think those statements are related to union activity? So I think they can be related to union activity. And I think that if you look at this, how are those statements related? So Mr. McCallum was a well-known union dissident because of the union financial mismanagement. Boone was a known was a union steward in in leadership in union leadership. Attacking her financial decisions, personal or otherwise, is related to her active is related to union activity and to the union's financial situation. Moreover, seems a bit of a stretch, doesn't it? Because my understanding is his criticisms of the union officials and their finances was that they had fancy cars, that they were taking money. And in this context, he was apparently criticizing her for not paying her bills and not having enough money. But but I don't think it's it's it's our place to judge what the content of his criticisms of the union were. I hear the one who said that the content of the criticisms was OK. You're the one who brought up. I think it's it's in it's in the it's in the reason it's in the wide range of reason. Most that employees are permitted to exercise their section seven activity. She was active. That's the question. Is the section seven activity? Are these statements related to union activity? And your your response is only based on the finances. So you agree that the license plate and taking care of the children are not union activity, correct? No. So the Virginia license plates comment the board found was was disparaging only because the Virginia license, Virginia license plates required a were cheaper. So that still relates to union financial mismanagement. When you look at the record with respect to how her children, the children statement, it was it said quit the union and take care of your kids. That was still related to the unions. They quit the union and take care of your kids. He said, take care of your kids. If you look at page. The record, page 253, Williams witnessed the quit the union, take care of your kids remark. If you look at what the record actually says, Boone testified that he said quit the union and take care of your kids. And Williams backed that up. We'll give you a couple of minutes and reply. Thank you. All right. Morning, your honors. May please the court. Greg Soter for the National Relations Board. Your honor, this is one of the board's bread and butter cases. It's not making law. It's applying established law to the facts and digging deep into the facts because there are such a wide range. Yes, sir. There I don't think either party cited this NLRB decision. I'm sorry, an employee. Well, I guess basically supervisor or manager was treating him. Okay. So. This was basically it's going to end with the sentence. Yes. For the union. Okay. So it certainly sounds like campaign speech. It's posted on Facebook. I'm not going to use the bad words. The guy's name was Bob. Bob is such a nasty MF. Don't know how to talk to people. Exclamation marks. F his mother and his entire effing family. Exclamation marks. What a loser. Exclamation marks. Vote yes for the. Now that ad hominem attack was considered campaign speech by the NLRB. Right. And it's hard for me to see how that ad hominem attack is campaign speech when this ad hominem attack was not campaign speech. Well, your honor, fortunately, I don't have the, you know, pure 60, you know, immediately in my mind. I assume the board found that the association between yes for the union and the fact that this person was a manager was enough to make a campaign speech. I thought you might say that. So, no, I'm it's a question I'm asking. I think that part of it is it is it is made a little bit more clear when the last sentence is yes for the right to get that. But I think imagine that this imagine the only reasonable way to read what was said here is there's a debate about the union. There's a debate about whether people are stealing money from the union in the midst of this debate. McClam makes some very, I think, beyond the line, like personal attacks and doesn't end it with the sentence against a representative of the union. Right. And doesn't end it with vote for the union. Right. But maybe the if the only the only reasonable way to interpret what was done is a bunch of campaign speech, an ad hominem attack with an implied at the end vote for the union. It doesn't seem like this would be any different than that. So I guess what I'm saying is, would this case be different if McClam had ended his attacks with the line vote for the union or vote against the union? Well, as you know, I, I can't respond to what the board would do because, you know, the board. I'm not the board. I'm just the board, the board boards, my client. I can only give you my personal my personal view on that. My personal view on that is that. If I was to go by here, 60, then I guess I would say, you know, the board has held that something similar in pure 60 happened. So it would apply the same way here. The point here, though, is not only did he not make those statements, that statement, he didn't make any link between his attacks on Boone and her license plates and her ability to pay bills and. Her union activity or and the union, I'm sorry, he didn't make a link between her personal ability to pay her bills, take her kids, etc. I think Boone says, and I'm in the J.A. here. The question is, what did McClam say? And she says it was just the same, you know, about not paying the bills and take care of tell them how you stole the union money. I'm like, what money, McClam? And then he says, I'm going to let it out. I'm going to let it out on Tuesday. So it seems like even even Boone understood there to be some connection between an attack on Boone's honesty and an attack on the honesty of Boone's union. That's that's a good point, your honor. But remember, we're not looking at what Boone understood. We're looking at what employees witnessing this would have understood. What if there had been a presidential debate? It's not too far away from real life where, you know, they're debating policy, they're debating who to elect, who to elect in the middle of the debate. One candidate just turns to the camera and says, my opponent is a bad parent and is is is not trustworthy with money. And then they go on arguing about politics, right? That seems like that's campaign speech, right? Even though it's very ad hominem, it's, you know, it's very personal. That's true. Boone wasn't running for election, though. Well, but she was a surrogate for people running for election. She was a surrogate for people hypothetical. Put it on CNN and have two surrogates arguing against each other about who to vote. I think the the the again, the question is, how would employees witnessing this see it? Would they see McClam attacking Boone as a surrogate by saying you have Virginia as a union surrogate, by saying you have Virginia license plates, you don't pay your bills and you don't take care of your kids? Would those people make the link between those accusations and the union and its alleged mismanagement of funds and so on and so forth? Now, in this in the setting that you're talking about, we're watching TV. There's two people, two talking heads. Right. And we know one of them is for one side. One of them is for the other. That's why they were brought here. This is what I agree with you that this is not protected campaign speech, but I think it's just squarely inconsistent with pure 60 because it really doesn't matter if vote for the union is stated or implied. What are we supposed to do? What should I do then? I think you're under pure 60 is one single post on on Facebook. Here you have really about 10 or 15 minutes. I'm not sure of back and forth arguing that is witnessed by multiple people and where there is no mention of the union. And I mean, hardly any mention of the union. In fact, you have several people to testify. Laco King, for example, is asked, did you ever hear him say the union can't pay its bills? No, he didn't say anything about the union. Boone, did Mr. McClam say the union doesn't pay its bills? No. Butler, can you recall him saying the union doesn't pay its bills? I can't recall him saying that he was just rambling on about a lot. So that's the first thing. The second thing you have to look at is Boone's reaction. Boone, when she speaks back to McClam, she doesn't mention the union based on all the testimony of all the witnesses. She says, leave me alone. Stop harassing me. Leave my name out of your mouth. Stop putting my personal business in the streets. Stop harassing me. Keep my kids out of it. I think there's no doubt it was personal. The statement was was personal. I guess I'm wondering from you, can you help me? Help me know how to draw the line between in the midst of a debate about a union campaign. How do I draw the line between personal attacks that are connected to that debate and personal attacks that are not connected to that debate? Well, you're you're you're hitting the nub of it. And that's what I was saying earlier. This is this is the kind of bread and butter cases that the board deals with all the time. The board's job is to thread that needle along all of these cases as best as it can. As the court knows, it's not an exact science. What I would say is there's a case that McClam cites, which is, I think, instructive, and that's Local 806. In Local 806, you had a union that was led by three members of the same family. They were all on the board. One of them was president, etc. Those people and there was a bunch of dissidents who were upset with the union. Those people, that family, they were making the policies that the dissidents were upset about. And over the four years that this this argument happened, it became more and more contentious. And more and more ad hominem attacks were thrown back and forth. And what the board found is that in that case, the Leon family, as they were, they came to personify the union. It became and they became their personal, their person became indistinguishable from the union. And therefore, it was no longer possible to really tell which to really separate the ad hominem attacks by the union members from their picketing and protected activity. It all sort of melded as one. I think that's me. That doesn't exactly answer your question, but I think that shows a point where you really the lines blur. In this case, we don't have this blurring of the lines because Boone, again, is is a steward. She's not on the executive committee. She's not making policy. She's a driver, right? She responds to his statement by saying, talk about other candidates business as if she's a candidate. Of course, she's not a candidate, but she's an incumbent and a surrogate for other candidates. Right. She tells him. And and that's I think that supports the board's view. She's actually telling McClam go and go do your dissident activity. Go go talk about how the union is corrupt and how they're ripping people off. Just leave me out of it. I don't want anything to do with this. Let me ask you about Miss Williams. Yeah. And there was a dissent of the sending member of the board who makes a pretty strong argument. I think that the majority said, well, when the management said you had the manager, you had Boone and you had. And the manager says, boom, you know, slapping someone is a terrible thing. He had mentioned as far as I can tell, he had mentioned McClam or anything.  And suddenly, William says. You fire her. You got to fire McClain. That doesn't sound conditional to me. Well, there was an if before that. But I understand your I understand your point. But I understand your point was in response to the management saying, you know, this is a terminal terminable offense to slap some. Mm hmm. And she interjects lamb by saying, well, you're going to fire her. You got to fire him. So I think, you know, the boards, the boards sort of explain that as sort of raising the stakes. Right. The way the way it seems to the way I read that is that what Williams was doing is variation on an argument I've heard anyway, which is if you do a you're going to have to do B. And you don't want to do B. So you're better off not doing a. And that's why the board found that she wasn't actually saying McClain should be fired. She was trying to make the case that for the employer not to fire either one of them, because and you have to remember. And this goes to the overarching negligence standard. And, you know, this is a good faith issue. The union, even if this is even if this could be construed as an implied request, the union violates its duty of fair representation. And that's it's a high bar to show a violation of that good faith standard. But it seems to me that the argument that you're making relies on this idea that what Williams was saying was I don't I didn't mean to say fire him. I just meant, you know, treat them equally. Don't fire her. That's kind of what the argument is. But the ALJ found. And I'm quoting from. Five ninety seven. Williams testified that she told Marshall that whatever you decide to do to McClain and Boone, it should be fair, should be equal. And the ALJ. This is the board talking about what the ALJ said that this was not credible, discredited that discredited that motive. So what do we do with that? But the ALJ seems to have specifically discredited the very, I guess, factual finding that the board wants to draw the majority wants to draw. Right. I submit there's a difference between. Not firing either one of them and treating them fairly. Right. I mean, for them not to be fired, there's still a range of punishment and differential punishments that could be imposed between the two of them. And that's what the board is getting at. Don't fire them. Do with her what you want to spend her for as long as you want. Give him a slap on the wrist. Just let her keep her job. But he didn't say suspend her and give him a slap. No. She said treat them at best. She said treat them equally. The best argument for the board here is that she was arguing for equal treatment. I think the best argument is that she was arguing for them not to be fired, which is a distinction. I understand them equal. I mean, well, that's what she testified about. And she was discredited about that. Right. She being Williams. Right. Williams testified. That's what I wanted. And she was discredited. So either we don't believe Williams, in which case. Well, the board didn't. Right. I mean, I don't know. So, I mean, fine. But if if Williams is not credible, why are I mean, I agree. Williams is not very credible in this situation. Why are we saying that there was fair representation by Williams when Williams is best defense was not a credible defense? Well, it's fair representation by the union. Your honor. She was the union. Right. But you so. There's a couple of things here. Okay. First, there's the and this is what I was going to get to before. And why it's such a high burden to show a violation of the duty of fair representation. Williams is not an attorney. She's not even a professional union employee. She's a steward. She drives all day. And from time to time, she puts on her steward hat and she shows up. In this case, she gets called in to do that. She is not used to weighing her language or thinking about how it's going to be construed. She's just thinking on her feet and trying to come up with what is her purpose there is to try and minimize the damage for Boone. She knows this is bad for Boone. Why is that her? Shouldn't her purpose also be to not throw McClam under the bus? I mean, she's supposed to represent him as much as she represents. Right. Right. Right. I mean, can you imagine if, like, I'm a defendant in a trial and there's another co-defendant and my lawyer tells the jury, if you're going to if you're going to convict the co-defendant, you got to convict this one, too. That'd be it. You wouldn't want that person to be your lawyer, right? No. If you were a union dissident, would you want Williams to be your rep? Again, Your Honor, Williams is not a lawyer. She's she's doing her best under the circumstances. And so if she shoots her mouth off. You know, you it's it's is it negligence or is it intentional? Was she trying to throw I'm sorry, I just don't see why that's relevant, that she's not a lawyer and she's doing her best. If she makes a statement regardless, that seems to imply that somebody she represents, McClam, should be fired. Does it matter that she was doing her best? I think it I think under the negligence standard, it does, Your Honor. The negligence is an objective standard, too. Right. But not a subjective standard. We should have pity on this woman who doesn't know what she's saying. No, no, no, no, no. Not at all. But I mean, follow the NLRA. Right. Right. Even if you're not a lawyer. Right. I just don't see how it matters whether she's a lawyer. Well, the point is. Is it are we are we finding that she had an ulterior motive in her agenda and she was trying to throw McClam under the bus? Or was this an instance of. Is this a matter of intent? Was she trying to throw him under the bus or are we find did she do so by what she said? Isn't that what we should be looking at? Yes, that is. I just don't know why we're focusing so much on her. And because she was thinking, I don't think that. Why is that relevant? Because, Your Honor, once you find and if the court, this court finds that her statement was an implied request to fire McClam, the next question is, did she act in bad faith? Right. Did she violate the duty of fair representation, which is a bad faith standard, which is, again, a tough, tough burden to meet. And so that's when you have to look at the context. That's when you have to look at, you know, why was she there? Why, as the board finds, why would she walk in there to defend Boone? And then minutes in, she turns to arguing that McClam should be fired. That goes completely against her her main purpose in that meeting, which is to limit the damage for Boone. And so it's much more reasonable to draw the inference that the board did, which was that she was continuing on her effort to prevent the damage, to limit the damage for Boone by arguing that neither of them be discharged. I think a more precise way to say it is not that it goes against her purpose. It goes against what the NLRA requires her purpose to be, but seems quite consistent with what was her most likely purpose, which was to punish a union dissident. I sort of like the Occam's razor simplest explanation for what happened. She wasn't there to talk about McClam, but she didn't like McClam. So she tried to punish McClam. I think it's you can see it that way. But again, the question is, is the board's is the board's inference reasonably defensible? You may find you may disagree to decide this issue based on bad faith. The board said she didn't advocate for him to be fired. And then the board said, even if she did, the union didn't violate its duty of fair representation. Right. The union, the board didn't stop. I thought the board relied on just that statement in isolation. And so this statement, which is if you're going to fire her, you should part two is not a request. That was the first that was the first part of the analysis. That's page for the last paragraph of page four. We find that, you know, that that that statement couldn't be found to be an implied request. However, the board continues. Even if we were to apply the second part of the analysis for duty of fair representation, we would find that that the union didn't violate it, didn't act in bad faith. So. And this goes back to what I was saying earlier. You know. When I got this case and I read this thing first, you know, I wasn't thrilled. You know, I sort of looked at my supervisor and was like, really? But. Even if you disagree with the way the board can see that your case is weak. No, I can see I can see that my my personal my personal initial opinion upon getting this case was, oh, I don't like this. Now, after that, I spent a couple of months on this case, you know, reading the entire transcript and briefing it. And now I'm quite confident standing in front of you in both of the both of the board's decisions. However, even if. And this is the important point. Even if you disagree with, you know, would have decided this case de novo. The question is, is the board's inference reasonably defensible and under the rational basis standard here? Would the facts of this case have required the board to find the violation? Was that the only outcome here, or did the board reasonably find, even if you may disagree, was there a reasonable basis for the board to reach its conclusion? And you may not agree, but there was a reasonable basis for the board to find that the statement itself wasn't an implied request. However, I do submit that there is absolutely a reasonable basis for the board to find, based on the entire circumstances and the union's history with McClam, that they were not trying to throw him under the bus. That they that she was doing her best and that it was not. It was not some kind of devious plot to get rid of him. There was no evidence that Williams or anybody in the union had it against McClam. He had to be, I think you can rightly say, in the seven years he'd been working there, he'd been a thorn in the union side. I mean, he, within months of being hired, he petitioned for desert. There's some evidence that not everyone in the union liked him, right? He was a union stewards hit him. The union steward hit him because of the personal insults. I admire you. I appreciate your candor. I welcome it. I admire that that you're, you know, you recognize that when you first look at this case, it looks the way you said it looks. And I appreciate that you're here to represent the board. And you're doing, I think, a better job in your role as an agent for the board than Williams did as an agent for McClam. I went to school for this point of a union, I think, is to protect workers. Absolutely. McClam was a worker. The union was supposed to be there for him. So, I mean, it actually seems like a very, in the same way that I think arguably McClam is arguing for a rule that might ultimately be quite bad for employers. Right. I think on issue one. On issue two, I think the board here is arguing for a rule that would really be a very anti-worker rule. What would that rule be? That the workers union is allowed to just, like, sacrifice the worker when they don't like his speech. But, it's, and this is what the board relied on. It makes no sense for Williams, where she is at that moment, to sacrifice McClam. Because then she's sacrificing Boone. And she doesn't want. Boone had just hit someone, so she was going to get disciplined. Disciplined. Not fired, hopefully. I mean, this was a preliminary investigation meeting, right? This happened the same day. Williams doesn't know at that point what the employer is planning to do with Boone. It's possible even Marshall doesn't know. You know? So, she's really, it might be different if this was, you know, a later on meeting with management, Boone and her stewards saying, okay, listen. You hit somebody in the face. That's unacceptable. You're fired. And then Williams stands up and says, well, in that case, you have to fire McClam, too. You know? I could see there, in that case, it would be a much stronger argument for your position. But in this case, where she's really flying blind, I don't think it rises to that level. Was that the only statement she made about McClam during this meeting? Yes. As far as the record shows, yes. So, I guess the best argument you can make is that at least the finding of no bad faith is supported by the record because it's one isolated statement about McClam. The entire context of this is, you know, trying to save Boone. And it's a conditional statement. Like, if you were going to fire her, you would have to fire him. Right. And so, I guess that would be your strongest argument, in my opinion. It would have to rely on the bad faith prong, I think. I think that's one of the best arguments, maybe the best in your view. I think the argument that, you know, about the context and really the purposelessness for Williams in this situation during a preliminary investigation of where they don't know what the employer is going to do with Boone, of just, you know, giving up right there at the beginning, saying, oh, you've said she could be fired based on what she does? Okay. Well, then, in that case, fire her. Just fire McClam, too. That just does not – I think you might think that you might view it, again, de novo, as, you know, just evidence that she just gave up and decided to throw the baby out with bathwater. I think the board's inference that she was just trying to convince Marshall not to fire the one of them, I think it is certainly reasonable and should not be overturned. Oh, I'm sorry. You haven't mentioned the fact, I don't think, that the ALJ, who actually heard this Miss Williams, did not believe anything she said. She found her testimony slanted, gratuitous. I don't know all the adjectives she used. Right. So you're painting a picture of Williams. We don't know her. Nobody in this room knows her. But there is an ALJ who actually listened to her testimony and didn't believe her. Right. But we're not looking at – all we have, right, is what happened that day. All we have is the allegedly implied request to fire McClam. All we have are those words.  So – and the boon corroborated Williams and said, yes, she said words to that effect. Okay. So – But what do we do with the ALJ factual finding? I guess Williams testified that all she meant when she said that was I just thought you should treat them both fairly. And he discredited that statement. Do we defer to the ALJ's credibility findings and factual findings? Yeah. The board deferred to them. And the board said it wasn't going to rely on Williams. The board didn't overturn the judge's credibility findings. What the board found is that in this context, the way it happened, the employer would not have understood that as a request to fire McClam. And even if based on the words itself, it would have understood that. There's no reason – it doesn't make sense that she was, again, within minutes of going in there in this preliminary meeting deciding, you know what, I give up. Just fire both of them. I'm just – this is actually – I don't really understand how this works between the board and the ALJ. If the ALJ makes a finding that this statement was a statement to fire McClam, the board can say it was not a statement to fire McClam. The board – the board looks at the words that were said at that moment, right? So not – we were talking before. It's not intent, right? It's whether – as far as the language goes, the board looks at the language itself. Now, her justification for it – That's on prong one of the test. That's on prong one of the test. So on prong one of the test, which is was there even a request to fire McClam, the board just looked at the words and said, this is conditional. This is not a request to fire McClam. But if this panel believes that prong one isn't met and we need to go to prong two and we're looking at bad faith, and the ALJ has said – When Williams testified, I wasn't saying that. I was just saying treat them equally. And the ALJ discredited that and said no. What do we do with that if we're on prong two, not prong one? You go back to what we were talking about earlier about good faith. If the whole context about it doesn't matter, if you don't think the context and everything leading up to that supports the board's conclusion, then you go back to what the board said at page four, the last paragraph of page four, which is at most this was a single statement during a preliminary meeting. And it wasn't repeated afterwards. It was inartfully said, yes, but it did not rise to the high bar of bad faith. And it's still objective standard. Yes. Yeah. All right. Thank you. Thank you, Your Honors. With that, we respectfully request that this court deny the petition. Thank you. Ms. Hazelwood, why don't you take two minutes? Thank you, Your Honor. Just one quick point on the second issue. The standard is not whether the union steward acted in bad faith. There's a heightened standard when a union steward requests or attempts to seek an employee's discharge. And that creates a rebuttable presumption that it acted unlawfully that can only be rebutted by a good faith showing that the union's actions were done in good faith based on rational considerations. Isn't the standard in a particular context that's not applicable here, this rebuttable presumption? I thought that was in a different context. No, that's the heightened standard here. If there's a demand, a discharge demand or an attempt to discharge, then that heightened rebuttable standard is the standard that's applied in this case. But I wanted to just return to the first issue. So with respect to the first claim, the standard is what an objective employee would have understood the attack to be, whether it was campaign related, related to Mr. McLam section seven activity. And there's evidence in the record to suggest that that was the case. So, for example. On page 177, Boone said when asked whether McLam statements were made about him, she said. At the time, I was the only person in there campaigning. After Boone's attack, Williams turned to another union, another candidate for the union office and said today was not a day to be campaigning, suggesting that there was an understanding that the campaign continued throughout the event. On page 273 of the record, when Williams was asked what McLam's reputation was, when she was asked what you know how he is means, she referred back to the fact that he doesn't like ATU. And when someone is showing support for ATU, he speaks out against them. Similarly. Butler also when she she tested testified at record page 211 that McLam made prior similar displays by down talking the union. I think this context is important and essential to this case. There are no questions. All right. Thank you. Thank you.
judges: Henderson; Walker; Pan